## A. J. PAXTON *v.* MEYER, WEIS & CO.

1. DEED OF TRUST. *For supplies to laborer.   Price, how fixed.*

Where a deed of trust, taken by a merchant upon a laborer's crop to secure payment for goods which the former obligates himself to furnish, to a certain amount, to the latter during a given year, does not fix the price at which the goods are to be charged, and it is not fixed by any other agreement, the law

fixes it at what the goods are reasonably worth at the time and place of sale. And in determining the reasonable value of goods thus sold at retail and on a credit, a court or jury should look in a great measure to the average of the prices charged by shopkeepers and retailers, as shown by cash sales and sales on a credit to solvent purchasers. The inquiry in such case should be, not as to the usual or market price, but as to the reasonable value of the goods; and the market price should be considered only as one of the means of determining the reasonable value.

2. Same. *Goods sold thereunder. Contract price, when disregarded.*

In a suit to enforce such deed of trust as is above indicated, where the proof shows that the prices charged, though agreed upon by the parties at the time of each delivery of goods, were exorbitant, largely more than the reasonable value of the goods, and only defended by the alleged insecurity of the debt, it is proper for the court to disregard such contract prices and to direct an account to be stated "at such rates for the articles charged as shall appear to have been customary, fair, and reasonable." Ordinarily, in the absence of fraud, the price agreed upon is binding, but where very exorbitant a court should not permit it to stand, unless it be shown that the parties traded on equal terms, and no advantage was taken of the ignorance or necessities of the buyer. In this case the parties were not on equal terms when the prices were agreed upon, as the buyer had previously circumscribed his means of obtaining credit by the deed of trust to the seller, and was not then free to decline the purchase of supplies because the prices charged were unreasonable. Under these conditions, the prices fixed do not contain the elements of a voluntary contract. And the seller being bound, under the deed of trust, to furnish the goods at a reasonable price, his refusal to do so was an act of bad faith, and the extorted assent of the buyer to the prices fixed by the seller was without consideration and invalid.

3. Same. *Precarious security. Debtor belonging to insolvent class. Account, how stated.*

The case above stated was referred by the chancellor to a master, with directions to state an account, "at such rates for the articles charged as shall appear to have been customary, fair, and reasonable in the kind of credit business and with the class of people with which and by whom said accounts were contracted," and to allow two and one-half per cent commission on the advances, and interest at ten per cent per annum. The master heard testimony to show that it was customary to charge higher prices to persons buying on the credit of securities such as the one sued upon than to solvent purchasers, and reported an account allowing a profit of from ninety to one hundred per cent on the goods sold, besides two and one-half per cent commission, and interest. The report was confirmed, and a final decree rendered thereon, from which an appeal was taken. *Held,* that the directions to the master, in effect, authorized the charge of higher prices against the debtor as an insolvent buyer than if he had been solvent, and to that extent were erroneous. The insolvency of purchasers is not to be considered in fixing the market price of goods. And if, in determining the reasonable value, a difference between cash and credit prices, in excess of interest, be allowed, it must

be on the basis of a fixed market price resulting from sales, in the regular course of trade, to solvent customers. The proper inquiry of the master was not as to the price of goods when sold to insolvent persons on precarious security, but as to their reasonable value, to be determined in a large degree by the customary price in sales to solvent purchasers on credit. CAMPBELL, J., dissented.

4. SAME. *By tenant to merchant. Notice to landlord. Supplies furnished. Contest for crop.*

Where a merchant who has taken a deed of trust, under the agricultural-lien law of 1876, upon a crop, to secure payment for supplies to be furnished the grantor to enable him to make the crop, fails to furnish such supplies, the landlord, after notice of the deed of trust, has no right, as against the merchant, to supply the tenant and take his crop in payment of the debt thus created, unless he has first requested the merchant to furnish the tenant the necessary supplies, and notified him that if he declined to do so, then he (the landlord) would make such advances.

APPEAL from the Chancery Court of Washington County.

Hon. W. G. PHELPS, Chancellor.

The case is sufficiently stated in the opinion of the court. ·

*J. M. Jayne*, for the appellant.

1. The court erred in its interlocutory decree in instructing the commissioner to state the account at such rates for the articles charged in complainant's accounts as from the papers in the cause, and from any other evidence that might be offered, should appear to have been customary, fair, and reasonable in the kind of credit business and with the class of people in which and by whom said accounts were contracted in 1877.

What the court meant by " kind of credit business and the class of people by whom the accounts were made," is rather difficult to determine. The records show that the kind of credit business as carried on by Langsfield was to get all that the mortgageors made, irrespective of the amount of supplies furnished to them. The charges are admitted to be such as to allow the mortgagee to clear one hundred per cent. This is simply extortion. The kind of credit business seems to be the same as is engaged in all over the country.

Now, is it proper for a court, in its decree, to make or attempt to create some vague distinction in the kind of business and with the class of people with whom a party is deal-

ing? How, under this decree, was the commissioner to make and state an account as required by the court; and what evidence was respondent called upon to produce, in this particular business, with this particular class of people, to show what was reasonable and fair? The chancellor should have instructed that an account be stated allowing the mortgagees a fair and reasonable per cent for their advances and their risk.

2. The court erred in not allowing Paxton for supplies and money furnished in making and gathering the crop when Langsfield failed to comply with his contract.

Where a merchant takes a deed of trust on tenants, agreeing to furnish them supplies, has the crop pitched, and then ceases to furnish, can the landlord, in order to save his rent and have his place cultivated, furnish the necessary supplies to make the crop and obtain his money from the crop for his advances, or can the merchant come in and reap the benefit derived from the landlord's advances and his own wrong in ceasing his advances? This is one of the questions presented for consideration. Contracts must be mutual; and when Langsfield agreed to advance, though the amount be limited, he should be required to advance enough to make and gather the crop. Is it true that, by a limitation in amount, a merchant can advance such a sum as he is sure to collect, irrespective of the kind of year for farming, and after this amount is agreed upon and advanced, and turns out to be insufficient to make and harvest the crop, can then force the landlord, in order to obtain his rent, to advance the supplies necessary to make the crop or lose the rent, and if the crop be a short one, to lose what was necessarily expended in getting his rent; while the merchant, who has made a profit of a hundred per cent, and being secured by his lien, takes all that is made after the rent? If Langsfield refused to furnish the amount agreed upon, or charged so exorbitantly that such amount was not sufficient to make a crop, and Paxton then had to furnish money and supplies to make the crop with, he is entitled to be paid for what he actually furnished the tenants to enable

them to make and gather their crop.  He had the right to do this in order to save his rent.  The court should have instructed the commissioner to ascertain what amount, if any, it was necessary for Paxton to furnish in order to have the crop made and gathered.  And this amount, when determined, should be allowed to Paxton.

*A. G. Paxton*, on the same side.

1. The court erred in its interlocutory decree.  In this the court orders the commissioner to " state the account at such rates for articles charged as from the papers in the case, and any other evidence that may be offered, shall appear to have been customary, fair, and reasonable in the kind of credit business and with the class of people in which and by whom said accounts were contracted in 1877."  What is meant by the " kind of credit business and with the class of people," is a question.  It is a vague and uncertain, and therefore an improper order.  It binds the commissioner to nothing.  He may abuse the intention of the court and not be subject to reprimand.  He could report under it that five hundred per cent was a reasonable profit on a barrel of flour in trading with this class of people, and it could not be complained that he had violated his instructions ; that $15 was fair and reasonable for a laborer's coat bought for negro trade, and sold in June, when the weather was warm, so that it could not have been an overcoat.  On the contrary, he could have reported that these people were ignorant and poor, and should be considered as a kind of " wards of the court" (which would have been more consonant with justice), and that on this account a price scarcely above cost was extortionate and unreasonable, and still no complaint could have been made.

In looking at what was done under this order, we are forced to the conclusion that the defendants, except Paxton, were presumed dishonest and unreliable to begin with.  Langsfield thought it fair and reasonable with these people to charge $36 for the execution of two mortgages upon printed blanks, which cost nothing but for acknowledgments and recording.

The commissioner did not allow this, but he did allow $15 as a fair charge to these people for the sort of coat above referred to, and the allowance was confirmed by the court. But the commissioner did think that $16 for a barrel of flour was only ten per cent too much, that $40 for a barrel of pork was only ten per cent too high, and that $4 was a proper charge for a sack of corn. These are but fair samples of the whole account.

I think that where security is given, and particularly where it is specially authorized by law, the law presumes that the debt to be contracted upon it is a solvent one, and that the security is good. Yet, under this order of the court below, Langsfield is allowed to trade with this people, upon security authorized by law, as though he was throwing away his goods, or as though his hope of payment depended upon some remote and undefined contingency. The order should have been : " The commissioner will state the account at such rates of charges as, from any evidence that may be produced, shall appear to have been customary, fair, and reasonable at the time."

2. The court erred in rendering a decree against Paxton for the amount of Langsfield's claim against the tenants. Sect. 3 of the agricultural-lien law of 1876 gives the laborer a lien for his work upon all the agricultural products grown by him or in whose growing he assisted, and for hauling and handling, etc. This lien is prior to all others except the lien for rent. Paxton, as appears from his answer, has paid large sums of money to these hired laborers. Now, in equity, if not in law, he should be subrogated to the rights of these laborers. This was not allowed in the lower court. We moreover hold that by sect. 2 of said act, which gives employers of laborers a lien, etc., operated upon by sect. 4, as well as by the spirit of sect. 1, Paxton has a lien upon the crop superior to the lien of Langsfield, for all necessary farming supplies furnished by him. The law allows a tenant to mortgage his crop before it is made, for supplies. And it certainly cannot be said that

when the planter has notice of such mortgage he is thereby prevented from making such advances to the tenant as are necessary to bring into existence the crop to which he must look for the payment of his rent.    See Laws 1876, pp. 109, 110, 113.

*A. G. Paxton* also argued the case orally.

*Percy & Yerger*, for the appellees.

The defences set up by the answer of the defendants below are, that the accounts sued on are false, fraudulent, and exorbitant, and want of notice by the planter of the existence of the mortgages to complainants.    The proof shows notice, both actual and constructive.

The depositions of several witnesses show that the prices were fair and reasonable, and that the goods were purchased by the negroes at the prices charged.    By a comparison of the accounts of Langsfield and Paxton against the negroes, it will appear that the prices of supplies furnished are about the same in each, but that interest charged by Paxton is at the rate of sixty per cent per annum.    The court below held that appellees were entitled to a decree against Paxton for the amount properly due on the accounts secured by the mortgages, but of its own motion referred the accounts to a commissioner to ascertain, by evidence to be adduced, whether the rates charged were reasonable, customary, and fair.    Upon this point the commissioner heard evidence offered by the defendants below, and reported that the account was reasonable, customary, and fair, except some few items.    He further reported, in accordance with the order of the court, the amount due complainants upon the account restated by him, and the amount of proceeds of cotton received by Paxton over and above his rent, and the amount actually furnished by him in supplies prior to the date at which his answer admits actual notice of complainants' mortgages.

The account, as stated by the commissioner, shows as due to the appellees $916.30.    The proceeds of the cotton in Paxton's hands, after deducting his rent and the amount of sup-

plies furnished by him previous to actual notice of the mortgages, amount to $2,388. Paxton's account shows that he paid out for picking the cotton $230.86. Had this been allowed him by the court, it would still have left in his hands, after paying his rent and for supplies furnished by him prior to actual notice as aforesaid, and for advances for cotton-picking, the clear sum of $2,157.18, proceeds of cotton covered by appellees' mortgages to the extent of $916.30.

The decree is the result of an unusually rigorous examination by the lower court, and is clearly right under the principles heretofore announced by this court. *Witczinski* v. *Everman*, 51 Miss. 841.

*W. L. Nugent*, for the appellees, argued the case orally.

GEORGE, J., delivered the opinion of the court.

On the 26th of February, 1877, Drew Whitly and nine others executed a deed in trust to secure one Langsfield for supplies to the amount of $1,200, and at the same time executed their note to said Langsfield for that sum, due September 1, 1877. On the same day Bohlen Lucas and six others executed another deed in trust to the same party to secure the sum of $500 in supplies, for which they also gave their note, due on the 1st of September, 1877. All these grantors were colored, and were tenants of the appellant, A. J. Paxton. The deeds in trust are exactly alike except as to the amount intended to be covered, and conveyed to a trustee all the crops of corn and cotton to be grown by the grantors on the plantation of said Paxton in the year 1877. There being an alleged failure on the part of Langsfield to furnish the necessary supplies, Paxton made advances, and when the crop was gathered, shipped and sold the cotton and applied the proceeds to the payment of his advances, including those which he had made after notice of the trust-deeds was given to him. The cotton was insufficient to pay Paxton, and he declined to pay any of the proceeds to Meyer, Weis & Co., who had become the assignees of the deeds in trust. Thereupon Meyer, Weis & Co.

filed two bills — one on each of the deeds in trust — to enforce their claims.    Paxton was made a defendant, with the grantors, to each.    By consent, the two cases were consolidated and tried together.

The chancellor held that the grantors in the trust-deeds were not bound by the contract price of the goods furnished under these deeds, and referred it to a master to ascertain the proper price to be charged.    The master was directed to state the account " at such rates for the articles charged as shall appear to have been customary, fair, and reasonable in the kind of credit business and with the class of people with which and by whom said accounts were contracted in 1877," and to allow two and one-half per cent commissions on the advances, and interest at ten per cent from the 1st of January, 1878.

The master heard testimony to show that a higher price was charged to persons buying on the credit of such mortgages than to solvent customers, and, acting on the idea that such higher charges were proper, after making some small deductions, reported as proper charges allowing a profit of about ninety to one hundred per cent, besides the two and one-half per cent commissions, and interest.    From this decree Paxton appealed.

One of the deeds in trust contained this stipulation : ."That the party of the second part (Langsfield) has agreed to advance to the parties of the first part (the grantors), from time to time, as they may need the same during the present year, in plantation supplies and other articles, to an amount not exceeding twelve hundred dollars, which last-named amount is evidenced by the joint and several promissory notes of the grantors of even date herewith, and bearing interest at the rate of ten per cent per annum from date, and payable on September 1, 1877."    The deed contained also a stipulation to pay two and one-half per cent commissions on the advances.    The other deed was like this, *mutatis mutandis*.

The first inquiry is to ascertain the meaning of the deed in trust as to the terms on which the goods were to be sold.

This deed obligates the merchant, Langsfield, to furnish goods during the year, as needed, to an amount not exceeding $1,200. The price is not fixed at which the goods were to be charged. In such a case, the rule is well settled that the price is to be what the goods were reasonably worth at the time and place of the sale.

In _Hoadley_ v. _McLaine_, 10 Bing. 482, it was said : " It is clear that the contract for the sale of a commodity in which the price is left uncertain is, in law, a contract for what the goods shall be reasonably worth." And in _Acebal_ v. _Levy_, 10 Bing. 376, it was said : "As no price is stated to have been agreed on, the law presumes the agreement to have been, or assumes as a condition of the contract, that the price was to be a reasonable one ; " that is, " such a price as the jury, upon the trial, shall, under all the circumstances, decide to be reasonable." This rule, thus expressed, meets the approbation of the most approved text-writers. Benj. on Sales, sects. 85, 86 ; Story on Sales, sect. 221.

The rule by which the reasonable value of goods is to be determined is, ordinarily, their market value at the time and place of the sale. In transactions between regular dealers in staple articles of general commerce, and where no extraordinary circumstances exist to derange temporarily the market price, that would be a safe standard by which to measure the value of goods. This market price is what the goods would readily sell for in the regular course of business, and it is fixed by competition among the buyers and sellers. When this competition is free and unimpeded, it fixes on articles of general commerce a single price in the market at the same time and place, and this price is quotable in a price-current. But even in respect to such articles, and in that kind of dealing, the market price on any particular day is not the absolute standard of the value of the goods.

In _Acebal_ v. _Levy_, 10 Bing. 376, it was said : " The current price of the day may be highly unreasonable, from accidental circumstances, or on account of the commodity having

been kept back by the vendor himself, or with reference to the prices at other points in the same vicinity, or from various causes.''

The market price may be unnaturally inflated, as by a speculation called '' a corner'' (see *Kountz* v. *Kirkpatrick*, 72 Pa. St. 398); and so it may be disturbed '' by illegitimate combinations for temporary, special, and selfish objects, independent of the objects of lawful commerce, and a forced and violent perversion of the laws of trade, not within the contemplation of the regular dealer, and therefore not deserving to be regarded as a proper basis upon which to determine value, when that fact becomes material in the administration of justice.'' *Smith* v. *Griffith*, 3 Hill, 337. This is true with reference to transactions between regular dealers by the wholesale, and in relation to commodities having a quotable market price, and when the dealings are on a cash basis or its equivalent. With reference to retail trading in the ordinary articles kept by shopkeepers, a market price is more difficult to fix, and it becomes still less potent as a measure of reasonable value. Mr. Mill, in his work on political economy, justly remarks that in the retail business there is no regular or standard market price; that '' there are cheap shops and dear shops, and in the same shops goods are sold at different prices to different customers.'' And it is a matter of common observation that the competition in the trade, the ignorance and sometimes the indolence of purchasers, the difference in the quality of the articles and the adulteration of some of them, not discernible except by skilled dealers, the connection in business or otherwise between the dealer and the customer prevent the fixing of a regular market price. This incertitude in the retail price is shown by the evidence in the case before us, it appearing that there is a difference among the merchants in the same neighborhood of from fifteen to twenty-five per cent in the price of several staple articles, even when sold on liens on crops.

It is evident, therefore, that in determining the reasonable

value of the goods sold at retail or on credit, there must be a wider latitude allowed than in sales by wholesale for cash. In the wholesale business the difference between cash and credit prices, ordinarily, is but little more, if any, than the current rate of interest for the time of the credit. In the retail business this difference is generally greater. Hence the greater difficulty in the fixing what is the reasonable value of the goods when sold by retail and on a credit. As there is no quotable market price as in wholesale dealings, the jury are to look in a large measure to the average of the prices charged by shopkeepers or retailers. They may look at these prices as shown by cash sales, and also in sales on a credit, and from all the circumstances fix the reasonable value. We have been unable to find a case in which a difference is recognized in the cash and credit price of an article as fixing a market value. It is clear that the interest for the term of the credit might be added in the credit price, but unless there be a fixed custom allowing a greater difference, it would be difficult to adjust properly the retail market price. As an element in fixing the market price, the insolvency of any of the purchasers is never considered, for legitimate and regular commerce proceeds on the supposition that the purchasers are solvent; or, if there be exceptions, they do not amount to the fixing of the market price. If such a difference between cash and credit prices be allowed in excess of interest, it can only be on the basis of a fixed market price, proved by the evidence and arising from the sales in the regular course of business to solvent customers. Manifestly, whenever this price, as thus fixed, is departed from on account of the insolvency of the purchaser, this price must or ought to vary in every instance, so as to adjust the price to the risk, according to the degree of insolvency of the particular customer. This price is exceptional, not regular, and arises out of an illegitimate commerce.

Yet it must be borne in mind that the *factum probandum*, the real point of inquiry, is not the market or usual price of the goods, but their reasonable value. The price may be

proven, and ought to be considered, but it is only as a means, or one of the means, to determine the reasonable value.

Applying these principles to the case before us, the directions of the decree, which were literally followed by the master in the examination of the witnesses, are erroneous. The direction was to ascertain what the class of persons to which the purchasers in the case belonged should be charged. It was, in effect, stated that higher rates were justifiable as against them than against other and more solvent purchasers. There is no justification for such a ruling in reason or authority. The merchant bound himself in the deed in trust to furnish the goods, as needed, at what they were reasonably worth. For this obligation he received a valuable consideration — the deed in trust on the crops of the purchasers. He carved out his own security, and must be deemed to have considered it sufficient, and he cannot now be heard to say, so as to relieve himself from his obligation to sell at a reasonable price, that his debt was insecure.

The chancellor's duty was to interpret and enforce a contract which had been made by the parties, not to make a contract for them, nor to fix the proper elements for such a contract. As we have seen, the law assumed, as a condition of the contract, that the price should be the reasonable value of the goods. The law takes no notice of the nature of the security. If the seller be satisfied with it, no one else can interfere, and his satisfaction with and acceptance of it bind him to the bargain he has made. The proper inquiry of the master was not as to the price of the goods when sold to insolvent persons giving only a precarious security, but as to their reasonable value, to be determined, in a large measure, as we have seen, by the usual and customary price as fixed by sales to solvent purchasers on a credit. The inflated price charged by merchants in the vicinity to insolvent purchasers was accidental and abnormal, and resulted from a perversion of the laws of trade. It grew out of a commerce which is illegitimate so far as it is based on the insolvency of the purchaser.

The duty of the Chancery Court was to ascertain the reasonable value of the goods. This duty, we have seen, is difficult to perform in retail trade; and it becomes an impossibility when, in addition to the other elements of uncertainty necessarily incident to that kind of business, courts are required to go further, and ascertain how much shall be added to the price on account of the insecurity of the debt. This insecurity exists in various degrees, from a slight shade below absolute solvency to the mere chance of payment which a reckless trader, tempted by the hope of enormous gains, may take in a sale to the utterly worthless. And if insecurity of the debt be an element of price, it should be graduated in every case by the degree of risk arising from the character of the particular debtor. No court has ever undertaken such an inquiry, and no court could make it satisfactorily. Besides, in a proceeding to enforce the collection of a debt it would be a strange anomaly that the court should increase the amount of the debt upon the ground, not that so much was due and ought to be paid, but on the supposition of the inability of the debtor to pay it — thereby increasing the inability. On the theory that inability to pay is a good ground for increasing the price, there must be an ever-increasing price to justify this continuing and progressive diminution of ability to pay.

It was shown that the prices charged were those agreed on at the time each delivery of the goods was made. We think the chancellor rightly declined to hold the purchasers bound by these prices. Proof of them was competent, and if nothing more had been shown in evidence, such proof would have warranted a decree for the amount thus agreed on. But as soon as proof was made, as it was in this case, that the prices charged and assented to by the customers were exorbitant, largely more than the reasonable value of the goods, and having for their justification only the alleged insecurity of the debt, then the agreed price ceased to be a proper standard in determining the controversy. Ordinarily, in the absence of fraud or imposition, the price agreed on is binding on the parties. But when the price is so exorbitant that, in the language of

Lord Thurlow in *Gwynne v. Heaton*, 1 Bro. C. C. 23, " the inequality is so strong, gross, and manifest that it is impossible to state it to a man of common sense without producing an exclamation " at its injustice, it would require the clearest proof of the *bona fides* of the transaction to make the bargain stand.   In such a case it should be shown that the parties treated on equal terms, and that no advantage was taken of the ignorance or necessities of the buyer.   When this appears, there is no relief against the consequences of folly and imprudence.   But that is not the case here.   The seller was already under an obligation to furnish the goods at a reasonable price.  The parties were not on equal terms.   The customer had encumbered all, or the principal and essential part of his means of obtaining credit, and therefore was not free to decline the purchase of the supplies because the price charged was unreasonable.   Under these conditions, the price fixed loses most, if not all of the elements of a free contract; it was dictated by the seller, and acquiesced in by the purchaser from an overruling necessity.   The seller was bound by his contract, on accepting the deed in trust, to furnish the goods at a reasonable price.   His refusal to carry out this contract was an act of bad faith, and the extorted assent of the purchaser to the price fixed by the seller was without consideration, and void.

We do not think that Paxton had the right to furnish supplies in derogation of Langsfield's right under the deed of trust, after he had notice of it.   Langsfield was not requested by Paxton to furnish the supplies necessary to raise and gather the crop, nor notified that Paxton would furnish them in case he failed to do so.

The decree is reversed and cause remanded, with instructions to restate the account according to the principles announced in this opinion.

CHALMERS, C. J., concurring.

The great practical importance of the questions involved, and the fact that this court is not unanimous, induce me to state the reasons for my concurrence in the principal opinion.

The obligation of the merchant under the mortgage taken by him was to "furnish supplies during the year to an amount not exceeding twelve hundred dollars." Under this stipulation he was bound to furnish them at such prices as might be from time to time agreed on, or at their reasonable worth. The chancellor held that although there was proof of a contract price at the time of each delivery, this was to be disregarded in view of the extortionate prices fixed and because of the hampered condition of the customers, who, owning no property, had mortgaged their future crop and thereby left themselves without the means of obtaining credit elsewhere. From this ruling the merchant does not appeal. While, therefore, the question is not properly before us, and while I think the contract price must always be accepted as *prima facie* correct, and indeed as conclusive, unless so excessive as to suggest extortion, I do not hesitate to express the opinion that the ruling was correct in this case.

The chancellor, having rejected the contract price as the standard of value for the goods delivered, referred the accounts to a commissioner for the purpose of ascertaining their reasonble value at the date of delivery upon a *quantum valebat*. He directed the commissioner to ascertain and report their "customary, fair, and reasonable value in the kind of credit business and with the class of people in which and by whom such accounts were contracted." This direction was correct so far as it directed an ascertainment of their customary, fair, and reasonable value. It was made incorrect by the addition of the words, "in the kind of credit business and with the class of people in which and by whom such accounts were contracted." There was nothing peculiar in the kind of business in which the parties were engaged. It was simply the buying and selling of food and clothing by a retail merchant to the consumer of such articles, and this ever has been and ever must be the most universal of all mercantile transactions. That the goods were sold upon the security of a mortgage of present or future acquired property, rather

Chalmers, C. J., concurring.

than upon the personal credit of the purchaser only, certainly could not have the effect of increasing the prices to be charged upon a *quantum valebat*. We cannot think that the chancellor meant colored, in contradistinction to white customers, by the expression, " the class of people by whom said accounts were contracted," though it is by no means certain, from the testimony submitted to and the report made by the commissioner, that it was not so understood by him.

If the chancellor meant to draw such a distinction, it was of course unwarranted; and if this was not what he meant, he must have intended indigent or insolvent persons, in contradistinction to wealthy or solvent ones. Such a line of demarcation would in this case be as unwarranted as the other. A vendor may, in selling property to an insolvent person upon a credit, charge by special agreement such per cent as he pleases for the added risk by reason of the insolvency; but where he has entered, as here, into a written contract to furnish goods, without specification as to the price, and that price is to be fixed by the courts upon a *quantum valebat*, the pecuniary condition of the buyer cannot enter into the question of price. By his contract to furnish the goods on a credit, the seller declares the buyer to be worthy of credit, and where a court or jury are called upon to fix the price of the articles sold, they cannot enhance that price by any estimate of whether the customer was solvent or insolvent. I recognize the customary rates charged for goods by dealers generally and paid by consumers generally as, ordinarily, the most satisfactory of all methods of arriving at their reasonable worth, but I repudiate the idea that any universality of custom can ever sanction the charging of poor men more than rich ones, or can ever compel the courts to accept it as a custom so fixed as to be binding upon them in determining the *quantum valebat* of the articles sold. It must not be said that we have repudiated customary rates in the ascertainment of value. On the contrary, we recognize the force of custom to the fullest extent, but it must be a custom applied to all persons alike. What we do

repudiate is the idea that the customers of a dealer are to be divided up into classes, and the value of goods sold on a *quantum valebat* determined by whether the buyer is white or black, or rich or poor, or lives in the country or resides in town.   No custom can sanction such a rule.   The shocking injustice of applying it is demonstrated by this record, which shows that goods were charged to these defendants at rates in some instances nearly double those at which the same goods were sold on the same credit to more favored buyers.   Defendants were entitled to the prices charged for the same quality of goods when sold upon the same period of credit to persons whose solvency was undoubted.   The erroneous result was produced by the addition of the improper words to the instructions given the commissioner, as indicated above.

CAMPBELL, J., dissenting.

I differ with my brethren as to the views expressed and the conclusion reached by them in this case.   I think the only question for our decision is as to the rule by which the value of the goods sold is to be arrived at.   Whether the chancellor did right to disregard the price agreed on at each delivery of goods is not before us, because the seller of the goods, who alone could complain of this action, did not appeal.   He acquiesced in it, and that is an end of it.   I agree that Langsfield was bound by his contract to furnish the goods stipulated for at reasonable rates, but insist that the criterion by which to determine what is reasonable is the customary rates at which goods were sold under similar circumstances.   What is reasonable is a question of fact, to be resolved from evidence, and the most pertinent and satisfactory evidence is what is customary in similar circumstances; in other words, what those engaged in such business have regarded as proper.   I know no other practical, and therefore legal, test of value than the transactions of men, and opinions based on such facts. The law does not deal in speculative theories as to value, but regards it as a practical question, to be settled by the trans-

actions of dealers and the opinions of those acquainted with them. The law has no standard of value for goods. It does not limit the profit which may be made on their sale. That is left to the agreement of parties, or, in the absence of agreement as to price, to be ascertained by evidence of what is the customary price ; and when that is established, I do not think any court has the right to pronounce it exorbitant, in contemplation of the law. What is generally practised and accepted as right among many persons having antagonistic interests in the practice may be safely accepted by courts as the nearest approximation to the right which is practicably attainable.

My interpretation of the decree for an account, and of the result attained by the commissioner and approved by the chancellor, is that the goods furnished by Langsfield were valued at such rates as the evidence shows to have been customary, fair, and reasonable in the kind of credit business which this was, in 1877. The qualifying words, " fair and reasonable," might have been properly omitted ; but they were unfavorable to Langsfield, if to either party, and he does not complain. I do not understand the mention by the decree of " the class of people " contracted with as having any reference to race, color, or previous condition of servitude, but only as descriptive of a distinctive class of persons, parties to the kind of " credit business " of which this is an instance ; and, thus understood, I find no fault with the direction, for I regard it as the equivalent of a direction to ascertain the customary rates in the kind of credit business which this was, and that I consider the proper direction in such cases. Customary rates are to prevail as to the value of goods in such sales, just as customary rates establish the value of the rent of land, or professional services, or anything else which has to be ascertained from evidence. I accept the doctrine announced in the opinion of Judge GEORGE as sustained by authority, viz. : that a reasonable price is such as the jury (or chancellor) upon the trial shall, under all the circumstances, decide to be reasonable ; but as the jury or chancellor should be guided to

a decision by the evidence, and not by some speculative standard unknown to the law, and as the only evidence of value must be customary rates, it is apparent that such rates are the means of arriving at values. The authoritative doctrine alluded to embraces the idea that " circumstances alter cases," and that all the circumstances are to be considered in arriving at what is a reasonable value.

The leading feature of the kind of business of which the transaction involved in this case is an instance is the mortgaging of a crop to be grown, as the basis of credit for the means to secure its production, which I regard as a most pernicious system, which has produced wide-spread evil, but which must be dealt with as it is, and not as I wish it was. It has been fostered by legislation, and it would be affectation of judicial ignorance of a prevalent system to ignore its existence. In this business the hazards taken by the party advancing are considered so great as to justify a profit which in other circumstances might be regarded as shockingly exorbitant. Practically, he who advances to make a crop, and has the future crop as security, is dependent on the success of the venture for his pay. He puts all, cost and profit, at hazard. The success of the venture and the realization of precarious security is dependent on so many contingencies as to make the hazard great. Each successive crop being sold in advance of its being made, as a pledge for the " supplies " by which to make it, the only hope of payment for such supplies is in the success of the operations of the year. This element of uncertainty, among other circumstances, has exerted an important influence in determining the scale of prices for goods advanced under this system, and establishing the prevalent custom, shown by the evidence in this case to have governed both the shopkeeper and the planter in selling goods in this kind of business.

There being a prevalent custom to sell goods at high prices in such business, it may be assumed to have been in the contemplation of the parties to this contract, which is silent as to the

rates at which goods should be sold, that the sale should be at the prices usual in that kind of business in the region of country in which it was done. What other shopkeepers sold similar goods at, upon similar terms, furnished a guide for a determination of what were proper prices in this case.

In response to a suggestion of error in the foregoing opinion of the court, by the counsel for the appellant, the following *addendum* thereto was announced: —

*Per Curiam.* — It is insisted, in a suggestion of error, that the effect of the decree below was to subject to the lien of Langsfield the interest of some who were not parties to the mortgages. The position of some of these parties is not exactly clear. We direct that on the remanding of the case the chancellor restrict the recovery of Meyer, Weis & Co. against Paxton to the interest, whatever it may be, of the mortgageors in the cotton which Paxton has received. Whatever interest the mortgageors had in the cotton, and also whatever interest each of the others may have induced Langsfield to believe the mortgageors, or any of them, had in the crop, will be bound.